**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **UNITED STATES OF AMERICA** <br> **v.** <br> **RICKY HUBBARD** | Crim. No. 20-507 (KM) <br> **OPINION and ORDER** |

The defendant, Ricky Hubbard, is charged in an Indictment (DE 12), in three counts:

Count One (possession of firearm and ammunition by a convicted felon), 18 U.S.C. § 922(g)(1);

Count Two (possession with intent to distribute cocaine, heroin and fentanyl), 21 U.S.C. § 841(a)(1) and (b)(1)(C);

Count Three (possession of a firearm in furtherance of a drug trafficking crime), 18 U.S.C. § 924(c)(1)(A)(i).

This case arises from local police officers' stop of the defendant's car which occurred on November 6, 2019, on US Route 22 eastbound in Union, New Jersey. Now before the Court are motions to suppress evidence obtained in connection with that highway traffic stop and a subsequent search of the car, as well as un-Mirandized statements of the defendant..

On January 9, 2023 I filed an opinion and order denying the defendant's pro se and counseled motions to suppress the fruits of the car search, without an evidentiary hearing. Thereafter, the defendant (not for the first time) developed an irreconcilable conflict with his appointed attorney, who sought to withdraw. The Magistrate Judge appointed new counsel, Joel Silberman, Esq. (DE 89) I permitted Mr. Silberman to file another motion to suppress, which challenged the police stop of the defendant's car. (DE 94) Believing that the

new motion presented possible issues of fact, I ordered an evidentiary hearing. In an abundance of caution, and wishing to give new counsel the opportunity for a fresh start, I directed the government to produce evidence regarding both the car stop and the car search. (2/1 conference, *see* entry after DE 94) The government filed a response to the motion, arguing that a hearing was not necessary (DE 95), but I ordered the hearing to proceed as previously ordered (DE 96).

On February 23, 2023, the Court convened an evidentiary hearing regarding both the traffic stop itself and the ensuing search. (DE 97).[1] The government presented a single witness, Det. Adedeji Akere, an officer of the Union, NJ Police Department. As exhibits, the government introduced video footage from the police car dashboard camera, from the body camera worn by Det. Akere, and from a subsequent search of the car back at the police station; illegal drugs, a gun, a water jug, and cellphones seized from the car; various photos; and a police report. The defense extensively cross-examined Akere, and in the course of doing so introduced Google maps, photos of the scene, traffic tickets that were issued, and a police report. In addition, I have considered the exhibits attached to the earlier motion to dismiss (DE 73), including the report of an expert on perception of odor. At the hearing, the defense opted not to introduce any testimonial evidence, relying instead on cross-examination and the exhibits it had introduced. (Tr. 96)

The parties agreed that post-hearing briefing was not necessary, opting instead for oral summations. (Tr. 99–109) At the close of the hearing, I reserved decision. (Tr. 109)

Thereafter, on February 26, 2023, having had the benefit of reviewing the transcript, Mr. Hubbard's counsel filed an additional short motion to suppress unwarned statements that his client made during the car stop. (DE 98) The following day, the government filed a response. (DE 100)

---

1 The transcript, a copy of which is filed at DE 99, is cited as "Tr." Useful as an overview is the police Investigation Report, introduced in evidence on a limited basis as Ex. G 921. (Tr. 51–52)

Before discussing the motions individually, I make the following overall observations about the credibility of Det. Akere's testimony. He joined the Union Police Department in 2016 and underwent the usual police academy training, including training in narcotics. As of November 6, 2019, he was a patrolman in the street crimes unit. On the morning of the traffic stop of Mr. Hubbard, Akere and his partner were tasked with addressing unspecified quality-of-life issues. It appears that Mr. Hubbard was not known to the officers beforehand; they had no preexisting bias or reason to target him. On the stand, Akere's demeanor was professional, and he struck the court as truthful and sincere. While he did refer at times to "good faith," there was otherwise little reliance on search and seizure boilerplate; his testimony was factual. While he pushed back at times, he conceded points appropriately. Cross-examination did not shake the core elements of Akere's testimony. Almost all of Akere's assertions could be checked against the dashboard and body video camera footage. The obvious exception, of course, was the olfactory evidence, but even that was referred to contemporaneously in the audio recording. In short, I credit Det. Akere's testimony.

## I. MOTION TO SUPPRESS WITH RESPECT TO THE CAR STOP

I first address the motion to suppress insofar as it challenges the basis for the officers' decision to pull over the defendants' car.

### A. Facts

On the morning of November 6, 2019, officers of the Union, NJ Police Department were dispatched to US Route 22, in response to citizen concerns about various quality of life issues unrelated to this case. (Tr. 14-15, 54) At approximately 7 a.m., two plainclothes officers, Det. Akere and Det. Peterson,[2] situated themselves in a stationary, unmarked police radio car. Sgt. Peterson was in the driver's seat, and Det. Akere was in the front passenger seat. The car was facing north on Ball Avenue where it forms a "T" intersection with US

[2] They were later joined by Sgt. Young and Lieut. Lagoa These designations, by the way, reflect later promotions. At the time, Akere, Young, and Peterson were patrol officers, and Lagoa was a sergeant. (Tr. 15)

22 eastbound. The car was equipped with a dashboard camera, and Akere was wearing a body camera as well. (Tr. 15–16 , 54–57)

From that vantage point at the side of the highway, Akere saw a burgundy minivan heading east on US 22. The minivan was a 2012 Kia Sedona, license plate U99KYP, concededly driven by defendant Ricky Hubbard. (Tr. 35 (defense stipulation to identification))

Akere "almost immediately" noticed two traffic infractions. (Tr. 58) He observed that the minivan's side windows were tinted. The morning sun was shining through the windshield, and the driver of the minivan could be seen through the tinted windows as a "shadowy figure." Akere could see that the driver held a phone to his ear with his right hand, and drove with his left hand. Akere believed the tinted windows, and also the phone use while driving (emergencies excepted), to be violations of New Jersey law. (Tr. 17–18, 58; Ex. D-1) These visual observations occupied a few seconds as the minivan drove past. (Tr. 19)

With Det. Peterson driving, the unmarked radio car pulled out of Ball Street and onto Route 22, behind the Kia minivan. As an aid to understanding, I pause to note that the entire pursuit occupied approximately 1.2 miles. For approximately the first half of that route, the highway had three eastbound lanes, which then narrowed to two.

After catching up to the minivan, the police paced the minivan's speed against their own car's speedometer. They determined that the minivan was traveling at 54 mph in a 45 mph zone. (Tr. 19–20) At this time, the police car was directly behind the minivan, with no other cars intervening. (Tr. 60) This all occurred on the initial stretch where there were three eastbound lanes. Both cars were traveling in the left lane, and they were passing slower cars in the right two lanes. (Tr. 23)

Akere explained that the officers had now observed three infractions: tinted windows, use of the phone while driving, and speeding. Akere believed these multiple infractions would provide a margin of safety as to the legality of the stop. (Tr. 22–24)

The government introduced in evidence the video recording made by the police car's dashboard camera. (Ex. G 703) That camera is automatically activated when the officers turn on the car's flasher and siren, and it begins to record both video images and sound. There is also, however, an additional 30 seconds of video footage without sound that *precedes* the activation of the flasher. (Tr. 20–21, 60–62)[3]

The video recording picks up after the pacing of the minivan's speed, as the highway has narrowed from three lanes to two. Near the beginning of the soundless, 30-second portion of the video, there is a silver car between the police car and the minivan (which nevertheless remains visible). Det. Akere explained that, as part of the merge from three lanes to two, the silver car cut in front of them. (Tr. 21–22) Almost immediately, the video shows, the police car pulled into the right lane, passed the silver car, and resumed its position in the left lane behind the defendant's minivan.

Immediately, the officers turned on the flasher and siren.[4] (At this time, the two vehicles were near the Stuyvesant Avenue underpass. (Tr. 66–67)) Presumably in response, the Kia minivan moved into the right lane. After traveling a short distance, it passed a Dalta[5] gas station and stopped on the shoulder of the road near Rosemont Avenue. This occurred at approximately the 54-second mark on the video. (Tr. 27) There, the shoulder is narrow, such

---

3 A question arises as to how the camera "knows" to begin recording 30 seconds before it is activated. The explanation is that this particular camera system has a "buffer" feature that continuously records for 30 seconds at a time, placing the video images in temporary or DRAM memory without yet writing to disk or other permanent medium. Once the dashcam's permanent recording function is activated by turning on the flasher/siren, that preceding 30 second buffer recording is preserved as well, albeit without sound. (*See* Tr. 25, 60–62) From time to time, this caused some temporary confusion about the sequence of events, which was usually quickly remedied. (*See, e.g.,* Tr. 24–25, 65–66, 68)

4 This event is signified by the camera's beginning to record both video and sound. The transcript reflects that the courtroom sound was not functioning properly while the government played this portion of the video, but a technician later remedied the problem, and the full video, with sound, was played.

5 Sometimes erroneously rendered as "Delta" in the record.

that the minivan protruded slightly into the right traffic lane. The police stopped their car behind the minivan, purposely positioning it farther into the traffic lane, so that passing cars would give it more leeway. (Tr. 27)

The total distance from Ball Ave., where the officers were initially positioned, to Rosemont Ave., where the minivan pulled over, is approximately 1.2 miles (verified on Google Maps, google.com/maps). The dashcam, as noted, did not start recording until about halfway through the route, but in the Court's estimation, the entire trip lasted between one and two minutes. (*See* Tr. 27 (car pulled over at approximately the 54 second mark on the video).)

**B. Analysis**

The initial issue, then, is the permissibility of the stop itself, based on the information available to the officers at that time.

A traffic stop of a car is akin to a *Terry* investigative stop of a person. *Berkemer v. McCarty*, 468 U. S. 420, 439 (1984) (citing *Terry v. Ohio*, 392 U. S. 1 (1968)); *see also Rodriguez v. United States,* 575 U.S. __, 135 S.Ct. 1609, 1614 (2015). Less intrusive than an arrest, a *Terry* stop requires reasonable suspicion of criminal activity, rather than probable cause. *Id.*; *Knowles v. Iowa*, 525 U.S. 113, 117-18 (1998). A classic reasonable-suspicion basis for a traffic stop, though not the only one, is the officer's observation of speeding or some other traffic violation. It is well settled that a moving automobile and its occupants are "seized" by virtue of being detained at the side of the road by the police. If that seizure is not supported by reasonable suspicion, evidence obtained as a result must generally be suppressed, unless some other exception applies. *See United States v. Mosley,* 454 F.3d 249, 252–56 (3d Cir. 2006) (surveying case law).

The test of reasonable suspicion is an objective one; if the facts and circumstances known to the officers rise to the level of reasonable suspicion, then an investigative stop is permissible. Indeed, if there is a sufficient basis for a stop, it does not matter whether the officers actually were motivated by the desire to investigate something else. "[The] cases foreclose any argument that

the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved." *Whren v. United States,* 517 U.S. 806, 813 (1996).

Police officers may perform investigatory traffic stops based on reasonable suspicion that "an individual has violated the traffic laws." *United States v. Delfin–Colina*, 464 F.3d 392, 397 (3d Cir. 2006). Relatively minor infractions have been held to justify a car stop. *See United States v. Richardson,* 504 F. App'x 176, 179 (3d Cir. 2012) (reasonable suspicion justified pulling over car with defective rear center brake light, an infraction punishable only by a fine); *see also Arkansas v. Sullivan*, 532 U.S. 769, 771, 121 S. Ct. 1876, 1878 (2001) (speeding, improperly tinted windshield, punishable only by fine); *Atwater v. City of Lago Vista*, 532 U.S. 318, 354, 121 S. Ct. 1536, 1557 (2001) (failure to fasten seatbelts of driver and young passengers); *Whren v. United States*, 517 U.S. at 817, 116 S. Ct. at 1776 (waiting for over twenty seconds at a stop sign, turning without a signal, driving at an unreasonable speed).

On its face, then, the reasonable-suspicion basis for the car stop appears adequate. The car was pulled over based on the officers' actual observation of speeding, use of the cell phone while driving, and (more problematically, *see infra*) tinted windows.[6] The defendant proffers some contrary theories, both legal and factual. I do not find them sufficient to undermine the validity of the stop.

Speeding, of course, is the quintessential basis for a traffic stop. *United States v. Wilson*, 960 F.3d 136, 145 (3d Cir. 2020) (upholding traffic stop where officer "saw the car speeding, changing lanes without signaling, and tailgating the car in front of it"); *see also Arkansas v. Sullivan*, 532 U.S. at 771 (speeding, improperly tinted windshield). Reasonable suspicion of speeding need not

---

6 At some later point, Det. Akere issued summonses for driving while using a cell phone, for tinted windows, and speeding, confirming the stated basis for the stop. (Tr. 51; Ex. G 921 at 5) A fourth summons, for operating a vehicle while in possession of narcotics, was issued based on evidence later recovered from the car. Obviously, it forms no part of the reasonable-suspicion basis for conducting the stop in the first place.

necessarily be based on radar, but may be based on the officer's observations while "pacing" the suspect's car.[7] *United States v. Garner,* 961 F.3d 264, 269 (3d Cir. 2020) ("Trooper Ramirez paced Fruit driving 75 miles per hour in a 55 mile per hour zone, so there is no dispute that the initial traffic stop was lawful.").

Mr. Hubbard's counsel objects that the dashcam footage does not show the officers' car actually pacing the Kia minivan (*i.e.,* matching its speed). He is correct that, at the time the video begins, the silver car has already cut in, and the officers are accelerating to pass it and reinsert themselves in the left lane behind Hubbard's car.[8] That, however, is not when the pacing occurred.

At the hearing, Det. Akere clearly testified that the officers paced Mr. Hubbard's minivan *before* then, when they were directly following the minivan:

> Q. So after you observed the Kia commit those two different traffic infractions, what did you and your partner do next?
>
> A. We then attempted to close the distance between our vehicle and that vehicle and later conducted a motor vehicle stop.
>
> Q. So while you were attempting to close the distance, what did you observe?
>
> A. We observed that that vehicle was traveling above the speed limit of 45 miles per hour. It was passing -- there was three lanes of traffic. It was passing all the cars in the right lane.
>
> Q. Okay. So you observed the driver traveling at what you thought was above the speed limit?
>
> A. Yes.
>
> Q. Were you able to pace the car?

---

7 Pacing, as described by Det. Akere, requires that the police car "get behind the vehicle, we match their speed and we watch the distance, right. If we're keeping the same distance, that's the speed that the vehicle is traveling." (Tr. 73)

8 Hubbard's brief in support of the motion (lacking the benefit of live testimony) seems to contemplate that the claimed pacing took place when the police were behind the silver car. (DE 94 at 7)

> A. Yes. We were able to get closer to the vehicle and accelerate to a certain speed where we were able to pace it at 54 miles per hour.
>
> Q. Going what miles per hour? I'm sorry.
>
> A. 54.
>
> Q. 54, I'm sorry. How much over the speed limit was 54 at the time?
>
> A. 9 miles over the speed limit.

(Tr. 19–20)

The later context confirms that the pacing took place shortly before the highway narrowed from three lanes to two (at which point the silver car inserted itself between the police car and the minivan). After viewing the initial "buffer" portion of the video, preceding the officers' activation of the flashers, Akere testified as follows:

> Q. Now, if you were pacing the Kia, how did another car get in between you?
>
> A. When we first noticed the vehicle, we were in the part of Route 22 where there's three lanes of traffic. As we got further down, there's only two lanes of traffic so the other lanes of traffic had to merge, and this other vehicle cut in front of us.
>
> Q. So is it your recollection here today that you had paced the Kia prior to the dash cam turning on?
>
> A. Yes.

(Tr. 22; *see also* Tr. 74 (pacing occurred "prior to where Route 22 became two lanes of traffic").) So the police car's acceleration to pass the silver car was not contemporaneous with, but rather came after, the pacing of the Kia minivan's speed at 54 mph. I find Akere's testimony credible on this point, as it comports with the natural sequence of events: observation of the traffic violation, followed by pursuit of the minivan and activation of the siren and flasher.[9]

---

[9] Mr. Hubbard's counsel made much of Det. Akere's demeanor, looking up at the ceiling when trying to remember the precise location (or range) where the pacing occurred. (*See* Tr. 102–03.) Akere's description of the location, however, was accurate enough. I did not find it unusual that he could not pinpoint it on a (somewhat blurry) map that he was shown for the first time on the witness stand, and it is common for a

Hubbard's counsel also objects generally that pacing is not reliable, and that there is no proof of calibration of the police car's speedometer. This is not, however, a municipal court trial of a speeding violation; the issue here is the officers' reasonable suspicion of such a violation as grounds for a traffic stop. Here, the standard is not one of scientific precision but reasonable suspicion, and pacing is at least sufficient to meet that standard. *United States v. Green*, 897 F.3d 173, 178 (3d Cir. 2018) ("The operative question is whether Volk had a reasonable suspicion that Green was speeding, not whether Volk could determine Green's exact speed. The District Court did not err in concluding that Volk had a reasonable suspicion that Green was speeding, so the stop was justified.")[10]

In short, I find that reasonable suspicion of a speeding violation was established and that, even standing alone, it provided an ample basis for the traffic stop. Hubbard was in fact issued a summons for speeding. (Ex. G 921 at 5)

In addition, and in the alternative, Mr. Hubbard's use of a cell phone while driving, in violation of local law, furnished the basis for a traffic stop.

> a. The use of a wireless telephone or electronic communication device by an operator of a moving motor vehicle on a public road or highway shall be unlawful except when the telephone is a hands-free wireless telephone or the electronic communication device is used hands-free, provided that its placement does not interfere with the operation of federally required safety equipment and the operator exercises a high degree of caution in the operation of the motor vehicle. For the purposes of this section, an "electronic communication device" shall not include an amateur radio.

---

person to look up and to the left when trying to access a visual memory, as I observed at the time. (*See* Tr. 103.) In my estimation, Akere made a genuine effort to recall, *e.g.,* the buildings they were passing when they paced the minivan, but could not do so. (*See* Tr. 75.)

[10]    Failure to calibrate the instruments used to measure a vehicle's speed, while often an issue at trial of a speeding violation, does not detract from the reasonable suspicion required to execute a traffic stop. Here, the officers could reasonably rely on the substantial margin of 9 mph (*i.e.,* 54 mph minus the speed limit of 45 mph) established by pacing.

N.J. Stat. Ann. § 39:4-97.3. *See also State v. Troisi*, 471 N.J. Super. 158, 165, 272 A.3d 51, 55 (App. Div. 2022). Hubbard's counsel stressed that, *after* the minivan was stopped, the officers observed only that Hubbard was holding, not using, the phone. Indeed, as Hubbard prepared to get out of the car, he disconnected a white cord from the phone. (Tr. 93) But Akere was not inferring from his observations during the car stop that Hubbard must have been using the phone earlier. Rather, Akere testified that he directly and contemporaneously observed the violation: When he first saw the minivan driving by at Ball Avenue, he "could see that the driver had his phone to his ear in his right hand." (Tr. 17)

Akere was asked to describe what he saw more specifically:

> A. I saw the driver with his phone to his ear, moving like this, as if he was talking on the phone.
>
> Q. Where was his other hand?
>
> A. His other hand was on the steering wheel.
>
> Q. Okay.
>
>> [AUSA] Spiro: The record should reflect that Detective Akere's right hand is making a symbol like he's talking on the phone, his left hand like he's on the wheel.
>
> Q. How long were you able to observe the driver speaking on the phone for?
>
> A. I saw him for a few seconds.

(Tr. 18–19)

Mr. Hubbard's argument focuses on what the officers saw after the car was stopped. Akere's observations of cell phone use, however, did not occur after the car had stopped, but before, while the defendant was actually driving and did not know he was being observed by the plainclothes police in their unmarked radio car.

In sum, Det. Akere's observation of Mr. Hubbard's use of the cell phone while driving furnished an additional, alternative basis for the traffic stop, and

Hubbard was in fact issued a summons for use of the cell phone while driving. (Ex. G 921 at 5)

I therefore need not rely on the third, alternative basis for the stop, *i.e.*, the observation of tinted windows. This violation, while perhaps clear enough under 2019-era law to satisfy the reasonable suspicion standard, is bedeviled by contradictory case law and the New Jersey Supreme Court's subsequent clarification of the applicable standard. For completeness, however, and to facilitate review, I briefly lay out the issue.

Officers' observation of tinted windows will often satisfy the reasonable-suspicion standard for a traffic stop. *See, e.g., United States v. Bellinger,* 284 F. App'x 966, 968 (3d Cir. 2008); *United States v. Roberts,* 77 F. App'x 561, 562 (3d Cir. 2003); *see also United States v. Leal,* 235 F. App'x 937 (3d Cir. 2007) (tinted windows satisfy higher probable cause standard as to traffic offense). That will be so, however, only if the tinting of the windows would violate local law. In the legal environment of 2019, these officers might have entertained a reasonable suspicion that these tinted front side windows[11] violated state law. Cases at the time had variously cited N.J. Stat. Ann. § 39:3-75 ("Section 3-75"), an associated regulation, N.J. Admin. Code § 13:20-33.7(d) ("Regulation 33.7(d)"), and N.J. Stat. Ann. § 39:3-74 ("Section 3-74").[12] *See, e.g., United*

---

11 The terminology "front side windows" means the window to the left of the driver and the one to the right of the front-seat passenger.

12 No person shall drive any motor vehicle equipped with safety glazing material which causes undue or unsafe distortion of visibility or equipped with unduly fractured, discolored or deteriorated safety glazing material, and the director may revoke the registration of any such vehicle.

N.J. Stat. Ann. § 39:3-75 ("Section 3-75").

> d) A motor vehicle . . . shall not be certified which has tinted spray or plastic material added to previously approved glazing in the front windshield or windows, vents, wings, deflectors, or side shields to the immediate right or left of the driver, because such condition changes the vision and light transmission properties of the glazing in areas where driver visibility shall not be obscured or obstructed; provided, however, tinted spray or plastic material may be applied to previously approved glazing in the front windshield if such spray or material extends no lower than six inches from the top of the front windshield or such

*States v. Wimbush,* No. CR 19-134 (FLW), 2020 WL 1873020, at *12 (D.N.J. Apr. 15, 2020) (upholding traffic stop based on, inter alia, observation of heavily tinted windows, citing Section 3-75); *United States v. Cherisme*, Crim. No. 17-431 (SRC), 2018 WL 6258880 (D.N.J. Nov. 29, 2018) (denying challenge to traffic stop without a hearing, citing Section 3-75), *aff'd,* 854 F. App'x 447 (3d Cir. 2021) (non-precedential opinion affirming based on officers' stop after observing "darkly tinted windows" that "violated a New Jersey law"); *State v. Cohen*, 347 N.J. Super. 375, 380, 790 A.2d 202, 205 (App. Div. 2002) (citing Section 3:74 and Regulation 33.7(d), and adopting *State v. Oberlton*, 262 N.J. Super. 204, 620 A.2d 468 (Law Div. 1992)). Whether the Kia minivan's windows were tinted as heavily as the windows in those cases, however, is difficult to assess. As noted above, the photographic evidence suggests that the windows were far from opaque. And recent New Jersey Supreme Court case law casts doubt on whether the prior cases' discussions were rendered based on an understanding of the New Jersey window tinting laws that was later deemed incorrect.[13]

---

> spray or material does not extend below the AS–1 marking on the front windshield.

N.J. Admin. Code § 13:20-33.7(d) ("Regulation 33.7(d)").

> No person shall drive any motor vehicle with any sign, poster, sticker or other non-transparent material upon the front windshield . . . or front side windows of such vehicle . . . .

N.J. Stat. Ann. § 39:3-74 ("Section 3-74").

[13] Three years after the events in suit here, the New Jersey Supreme Court set itself the task of clarifying disparate interpretations of the window-tinting laws. *State v. Smith*, 251 N.J. 244, 276 A.3d 1114 (2022). *Smith* ruled that the provision applicable to such tinted-window cases was Section 3-74, not Section 3-75. And the restrictions of Section 3-74, it held, apply only to windshields and front side windows, not rear windows. It further held that "the term 'non-transparent' used in [Section 3-74] is not impermissibly vague" and should be understood to mean that reasonable suspicion of a tinted windows violation arises when a vehicle's front side windows "are so darkly tinted that police cannot clearly see people or articles within the car." 251 N.J. at 265, 276 A.3d at 1126.

The issue post-*Smith*, then, would be whether the tinting of the Kia minivan's front side windows satisfied the standard of being able to "clearly see people or articles within the car." When the morning sun shone through the untinted windshield, Det.

At the hearing, Mr. Hubbard's counsel appeared to be faulting the officers for holding off the traffic stop until they could observe further violations, such as speeding. (Tr. 59–60, 70) Relatedly, he appeared to be criticizing the officers' failure to turn on the flashers and begin video recording until they had traveled approximately a half mile. (Tr. 104) Any such delay, however, would have violated no right of the defendant. Moreover, the entire pursuit and stop of the minivan took place over a distance of 1.2 miles, and could not have occupied more than a couple of minutes.

Counsel made a bit more headway with his attack on the officers' statement in their report that Mr. Hubbard appeared to unnaturally delay pulling over, suggesting consciousness of guilt. In doing so, according to the police, he was forgoing the safety of the Dalta gas station parking lot for a far more dangerous location on a narrow shoulder just past the gas station. After reviewing the video, I cannot agree with that judgment. On the video, when the flasher/siren comes on, it appears that Mr. Hubbard immediately taps his

---

Akere was able to view the defendant's "shadowy figure" through the front side windows and perceive that he was holding the phone to his ear. The government's photo of the empty, parked minivan would appear to permit the viewer to peer through both side windows and discern the outlines of cars and buildings on the other side. (See DE 95 at 4.)

The government urges that *Smith* be discounted as a state court interpretation of federal constitutional law that in any event post-dates the relevant events. It is true that *Smith* technically was considering the federal constitutional issue of reasonable suspicion, but in doing so, it was interpreting the meaning of the state window tinting laws themselves. Conceding *arguendo* that *Smith* was merely stating what had always been the law, the government nevertheless maintains that Akere made a reasonable mistake of law under the circumstances. *Compare Heien v. North Carolina*, 574 U.S. 54, 135 S. Ct. 530 (2014) (upholding traffic stop despite later holding that state law required only one, not two, stop lamps, because officer's mistake of law was reasonable). *Heien* requires careful application of such precedents as *United States v. Delfin-Colina*, 464 F.3d 392, 399 (3d Cir. 2006) (mistake of law ordinarily not justification for traffic stop), although the low threshold of reasonable suspicion and that the requirement that the mistake of law be reasonable afford some wiggle room. At any rate, Det. Akere cannot be faulted for failing to anticipate a legal interpretation that multiple judges, including judges of this court, had likewise failed to anticipate.

I also do not address Regulation 33-7(d), which does expressly refer to tinting. *Smith* may call into question but does not seem to completely resolve that regulation's continuing viability.

brakes, then puts on his turn signal to move into the right lane, with the police car close behind—a matter of perhaps six or seven seconds. (Tr. 77–79) At that point, the minivan was already close to or actually passing the Dalta station. (Tr. 80–81) In short, on a full factual record, I will not draw any negative implication from the alacrity, or not, with which Mr. Hubbard pulled over; in my estimation, he responded reasonably. That said, the issue is a minor one.

In summary, then, I find that the traffic stop of the Kia minivan was constitutionally permissible based on Akere's observation of violations of the speed limit and the prohibition of using a cell phone while driving. There is no necessity to rule on the potentially complex issue of the tinted-windows violation.

## II.    RENEWED MOTION TO SUPPRESS WITH RESPECT TO THE CAR SEARCH

As noted, the Court has already written one opinion and order (DE 81) denying a motion to suppress (DE 73) based on the alleged illegality of the car search itself. Much of the following discussion therefore will seem familiar, and my ultimate ruling remains the same. I have, however, revisited my analysis with the benefit of a full factual record.

### A.    Facts

To resume: The Kia minivan stopped by the side of US 22, past the Dalta gas station and near the Rosemont Avenue underpass. There, the highway shoulder is narrower than it is elsewhere on Route 22. (Tr. 89) The left wheels of the stopped minivan encroached on the right traffic lane. The police stopped their car behind the Kia and farther out in the traffic lane, for visibility and safety. Det. Akere believed the location was unsafe, in that passing traffic was close enough to make the minivan shake. (Tr. 84–85)

Akere started to get out the police car, and at around the same time, activated his body camera. (The bodycam video was introduced in evidence. (Ex. G 700; Tr. 28)) In this summary of the events, I draw on the statements highlighted in the hearing transcript, as well as the bodycam video/audio itself.

Akere approached the Kia on foot from the passenger side. (Tr. 29) In
response to Akere's request, Hubbard lowered the window. While speaking to
Hubbard, Akere immediately detected the odor of raw marijuana. (Tr. 29) He
asked to see Hubbard's license, registration, and proof of insurance.

Inside the car, Akere saw multiple air fresheners. There were five or six
by the center console, and another on the driver's seat floor. (Tr. 33, 37) From
his training and experience, Akere knew that multiple air fresheners are used
to mask the smell when persons are transporting marijuana by car. (Tr. 29–31,
33). The air fresheners are plainly visible on the bodycam video, although it is
not clear exactly when Akere first noticed them. (Ex. G 700)

On the video, Akere can be heard informing Hubbard "You're driving with
your phone in your hand. You're using your phone as you drive. I saw you with
your right hand." At the time, Akere was distracted by, *inter alia,* security
precautions and speeding traffic, and he did not immediately list the other
violations, *i.e.,* speeding and tinted windows. (Tr. 30) He told Hubbard he would
be giving him a ticket.

Det. Akere told Mr. Hubbard to turn off the engine and get out of the car.
A civil argument followed, in which Hubbard resisted getting out of the car, but
Akere replied that he was legally obligated to do so. Hubbard finally complied
when Akere threatened to arrest him if he did not do so. Hubbard disconnected
a cell phone from a white cord and got out of the car with the phone in his
hand, apparently intending to record the encounter. (Tr. 92–93, 33) Akere told
him the encounter was already being recorded. He instructed Hubbard to put
the phone down quickly and keep his hands up.

Hubbard asked why he was being pulled out of his car. Det. Akere gave
the reason: While they had been speaking, he had smelled the odor of
marijuana coming from the vehicle. Hubbard denied that he had any
marijuana. In response to Akere's questions, he repeatedly denied having
smoked marijuana in the car. Akere told him to keep his hands up and spread
his legs so he could be searched. Hubbard continued to object to the police
looking inside the car without a search warrant.

Once Mr. Hubbard got out of the car, Det. Akere performed a search of his person. He recovered $102 in cash from Hubbard's pocket. Akere handed back the money because Hubbard was not then under arrest and the money was not being seized.[14] (Tr. 34–35)

Akere agreed that around this time Hubbard, although not yet arrested, was detained and was not free to leave:

> Q.  At that point in time when you say he was detained, was he free to leave if he wanted to, or he was being held there?
>
> A.  He was being held there.

(Tr. 94; *see also* Tr. 35 (defendant was not yet under arrest).)

After inspecting the money, Akere asked a number of questions about the car and whether Hubbard had done any "work" on it. He asked whether Hubbard "was the only one who drives the car," and Hubbard replied "Yes." (*Id.* at 34)

In addition to the marijuana smell and the air fresheners, Det. Akere saw what appeared to be a loose panel by the car's radio, with tools nearby. (Tr. 30, 31–32. (The loose panel is also visible on the bodycam video. (Exs. G 700, G 320)) From his training and experience, Akere knew that vehicles do not commonly have loose paneling unless there has been tampering. He was also aware that there are voids behind such panels that are used to conceal illegal substances. (Tr. 32)

The officers began to look inside the car. Background conversation between the officers reflects that something near the radio looks "pried" and there is a reference to the air fresheners. Akere opened a blue and white Igloo water jug that was lying on the front seat of the car. It contained marijuana in a Ziploc bag, as well as loose pieces of marijuana. (Tr. 36; Ex. G 13).

---

[14]    The money consisted of one $50 bill, one $20 bill, four $5 bills, and twelve $1 bills. Det. Akere conceded that this cash, "[b]y itself," was not "indicative of narcotics dealing. (Tr. 95)

The officers then placed Mr. Hubbard under arrest. (Tr. 37) The officers recovered one cell phone from Mr. Hubbard, and two more from the car. (Tr. 38; G Ex. 100)

Det. Akere pulled out a drawer on the car's console, and in the void beneath the drawer, found a plastic bag containing folds of heroin and some plastic jug containers of cocaine. (Tr. 39–41; Exs. G 8, 9, 10, 11, 17, 18, 19.) He attempted to pry open a loose panel with a tool from the car. (Tr. 84)

Det. Young, who had arrived shortly before, expressed the opinion that it was unsafe to carry on searching by the side of this busy highway, and also suggested that there were better tools back at headquarters. (Tr. 39, 85) The officers summoned a tow truck so they could carry on the car search in a safer location. (Tr. 41)

The bodycam audio captured Sgt. Peterson's remark that "This car freaking reeks of weed." (Tr. 42)

The Kia minivan was towed back to the police station, with the officers and Mr. Hubbard, now under arrest, following in the radio car. (Tr. 42)

Back at the police station, the police performed a more thorough search of the car. (Tr. 43–44. Again, Det. Akere's body camera was recording. (Ex. G 701)) Akere noted that several of the officers present remarked on the raw marijuana smell emanating from the minivan.

The additional search at the station yielded a black handgun, later determined to be stolen. (Tr. 44) Akere found the gun in a deeper void, which he described as a "drop," behind the location of the earlier heroin and cocaine seizure. (Tr. 45–46; Ex. G 103) In this search, Akere also recovered additional wax paper folds containing heroin (Ex. G 15, 16), and additional plastic jugs of cocaine (Ex. G 12). (Tr. 44, 47–48)  From the well in the driver's side door, he recovered a grinder with residual amounts of marijuana. (Tr. 48–49)

Mr. Hubbard was issued summonses for tinted windows, using a cellular phone while driving, operating a motor vehicle while in possession of narcotics, and speeding.[15] (Ex. G 122 (police report); Tr. 51)

**B. Discussion**

This was a legitimate traffic stop. *See* Section I, *supra.* Even a legitimate traffic stop, however, cannot be "prolonged beyond the time reasonably required to complete th[e] mission of issuing a ticket" for the traffic violations that were the basis for the stop. *United States v. Rodriguez*, 135 S. Ct. 1609, 1612 (2015); *see also United States v. Clark,* 902 F.3d 404 (3d Cir. 2018). Still, the officers may pursue further investigation based on facts learned in the course of a legitimate stop. *See id.* at 1616-17. Thus an officer may "expand the scope of a traffic stop and detain the vehicle and its occupants for further investigation if [the officer] 'develops a reasonable, articulable suspicion of criminal activity.'" *United States v. Frierson*, --- F. App'x ----, 2015 WL 3485994 (3d Cir. 2015) (quoting *United States v. Givan*, 320 F.3d 452, 458 (3d Cir. 2003)). Unsatisfactory responses to legitimate questions, furtive or suspicious activity, refusal to obey officers' justified instructions, and, *a fortiori,* observation of further infractions may furnish such a basis for extending a stop. *See, e.g., Illinois v. Wardlow*, 528 U.S. 119, 124 (2000); *United States v. Green*, 897 F.3d 173, 185–86 (3d Cir. 2018); *United States v. Moorefield*, 111 F.3d 10, 13-14 (3d Cir. 1997).

As established above, the officers observed traffic violations and stopped the Kia minivan. At that point, they were entitled to tale a reasonable time to check the driver's license and registration and perform other steps preliminary to issuance of a summons. Here, they never approached the *Rodriguez/Clark*

---

15 On cross examination, counsel for Mr. Hubbard pointed out that the location written on all four summonses was US 22 and Ball Avenue, where the officers were initially situated, whereas the speeding was paced a little farther down the highway, and the drugs were seized still farther away at the Rosemont Avenue location. (Tr. 90–92; Ex. D-12) I attach no great significance to that minor imprecision. There was no lack of clarity at the hearing regarding how and where the officers observed the violations.

time limit, because they quickly developed reasonable suspicion and probable cause of further criminal activity.[16]

Immediately upon approaching the car, Det. Akere smelled marijuana, evidence of a further criminal offense.[17]He made other observations which, in light of his law enforcement experience and training, raised further suspicions of drug possession or trafficking: namely, the presence six or seven air fresheners (commonly used to mask the smell of marijuana), as well as loose paneling in the center console, near the radio (suggestive of a "trap" in which to conceal drugs or other contraband). These facts, to an experienced officer, would create at reasonable suspicion sufficient to prolong the stop. Some corroboration was supplied by Det. Peterson's later comment, captured on audio, that the car "freaking reek[ed]" of marijuana.

The smell of marijuana—even standing alone, but *a fortiori* in conjunction with the multiple air fresheners and the loose panel—was sufficient to establish probable cause for a warrantless auto search. *See United States v. Green*, 897 F.3d 173, 178 (3d Cir. 2018) (smell of marijuana); *accord United States v. Ramos,* 443 F.3d 304, 308 (3d Cir. 2006); *United States v. Wimbush,* Crim. No. 19-34 (FLW), 2020 WL 187 1873020, at *16 (D.N.J. Apr. 15, 2020) (car stop based on tinted windows followed by odor of marijuana, justifying search). *See generally Maryland v. Dyson,* 527 U.S. 465, 467 (1999) ("automobile exception" permitting search of car based on probable cause, without the necessity of a warrant); *United States v. Burton,* 288 F.3d 91, 100 (3d Cir. 2002) (same). That authorization extends to "every part of the vehicle and its contents that may conceal the object of the search" *United States v.*

---

16 As it happened, Mr. Hubbard was placed under arrest some four minutes after the stop began.

17 The defendant attached to his original motion certain documents concerning New Jersey's decriminalization of, e.g., possession of less than 6 ounces of marijuana, as well as new guidelines for officers who smell marijuana during a vehicle stop. (*See* DE 73-4, 73-5) These, however, took effect in February 2021; they have no bearing on a traffic stop in November 2019. At that time, marijuana was unquestionably a controlled dangerous substance. (Tr. 30)

*Donahue*, 764 F.3d 293, 300 (3d Cir. 2014) (*quoting United States v. Ross*, 456 U.S. 798, 825 (1982)), including closed containers within the vehicle, *California v. Acevedo*, 500 U.S. 565, 572 (1991); *United States v. Johns*, 469 U.S. 478, 485, 105 S. Ct. 881, 886 (1985).

Counsel sought to cast doubt on Akere's testimony that he smelled marijuana, stressing that it was contained in a plastic Igloo water jug. But even if the jug had been sealed airtight (which was not established), this would not account for other sources: *e.g.*, diffusion of this notoriously pervasive odor before the jug was closed, or the presence of the marijuana grinder, containing residue, in the door well of the car.

I give no weight to the expert opinion of Dr. Doty, who inspected the marijuana over two years after the seizure and opined that there would have been no discernible odor. (DE 73-7) The passage of time aside, I find that his conclusions, based on very different conditions from those obtaining at the time of the car stop, lack a reasonable scientific basis. Dr. Doty did not know, nor could he know, when the jug was closed, how tightly it was closed, the amount of time the marijuana might have been exposed to the air in the car, and other critical facts. And, of course, the Court has already found credible Det. Akere's account that he did in fact smell marijuana.[18]

Counsel also faulted the agents for failing to obtain a warrant before continuing the vehicle search after the minivan was towed to the police station. They were not required to do so, because the automobile exception to the warrant requirement is a bright-line rule that does not depend on the

---

18 Other federal courts have given little or no weight to similar opinions rendered by Dr. Doty. *See United States v. Shumaker*, 21 F.4th 1007, 1012 (8th Cir. 2021) (noting that "the district court explained why it credited the testimony of [the officer] over the testimony of Dr. Doty"); *United States v. Johnson*, No. 09-85, 2010 WL 2271152, at *2–*4 (M.D. Ala. May 7, 2010) ( "as soon as he smelled the strong odor of [raw] marijuana coming from the car, [the officer] had probable cause to search the car" . . . . Dr. Doty's opinion . . . is entitled to little weight because he did not know these facts or assess how they might impact his conclusion. Without considering those factors, Dr. Doty's opinion testimony is simply speculative."), *report and recommendation adopted*, No. 09-85, 2010 WL 2271227 (M.D. Ala. June 4, 2010), *aff'd*, 445 F. App'x 311 (11th Cir. 2011).

exigencies of a particular case. It the police are entitled to search a vehicle immediately after stopping it, then they are likewise permitted to search it after it is impounded. *See Michigan v. Thomas,* 458 U.S. 259, 260–62 (1982); *United States v. Johns,* 469 U.S. 478, 485–86 (1985).[19] Continuing exigent circumstances are not required. *See United States v. Donahue,* 764 F.3d 293, 300–01 (3d Cir. 2014). "As a result, the government can search an impounded vehicle without a warrant even though it has secured the vehicle against the loss of evidence and it has the opportunity to obtain a warrant for the search." *Id.* at 301. Even a delay of five days between the seizure and search of the car is "immaterial" to the validity of the warrantless search. *Id.*

To the extent the motion seeks suppression of the items seized from the Kia, whether at the side of the road or later at the police station, it is denied.

## III. MOTION TO SUPPRESS UNWARNED STATEMENTS

Following the evidentiary hearing, counsel for Mr. Hubbard filed a supplemental *Miranda* motion to suppress unwarned statements he made in response to police questioning during the car stop. Neither the motion (DE 98) nor the government's response (DE 100) is very specific about which statements the motion is referring to, or which statements the government might wish to introduce in evidence. The focus here is on the four-minute period between the beginning of the car stop and the formal arrest of Mr. Hubbard.[20] There appears to be no contention that *Miranda* warnings were administered.

---

19 Nor was it unreasonable or impermissible to impound the car. When the car was towed, the defendant was under arrest, and the unacceptable alternative would have been to leave it by the side of the highway, partially obstructing traffic. *See Chambers v. Maroney,* 399 U.S. 42, 52 n.10 (1970); *United States v. Estrada*, 459 F.3d 627, 634 n.7 (5th Cir. 2006) ("The officers do not need to obtain a warrant to move the vehicle from the roadside to a garage if there is probable cause to search a vehicle.").

20 The government states that it will "self-suppress" the colloquy concerning work that had been done on the car, which it seems to concede occurred post-arrest. Gov't Br. (DE 100) at 4–5 n.3. *See generally Berkemer v. McCarty*, 468 U.S. 420, 434, 104 S. Ct. 3138, 3147 (1984) "There can be no question that respondent was "in custody" at least as of the moment he was formally placed under arrest and instructed to get into the police car.")

*Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602 (1966), and its progeny implement the guarantees of the Fifth Amendment by requiring suppression of unwarned[21] statements acquired as a result of (a) "interrogation" of a person who is (b) in "custody."

"Interrogation" refers to explicit questioning or the equivalent. It includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S. Ct. 1682, 1689–90 (1994).

"Custody" refers to "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler,* 463 U.S. 1121, 1125, 103 S. Ct. 3517, 3520 (1983). A roadside stop is of course a Fourth Amendment seizure, but the issue of custody is distinct. In *Berkemer v. McCarty*, 468 U.S. 420, 104 S. Ct. 3138 (1984), the Supreme Court rejected any bright-line rule as to whether a detained but not yet arrested motorist is in "custody" for *Miranda* purposes, leaving the issue to case-by-case adjudication.[22] "Where, as here, the individual has not been openly arrested

---

21 The *Miranda* warnings are too familiar to require elaboration. The suspect must be told that he has the right to remain silent, that any statements he makes can be used against him, that he has the right to the presence of attorney, and that an attorney will be appointed if he cannot afford one. *Miranda,* 384 U.S. at 479. (I adopt the male pronoun because this defendant happens to be male.)

22 *Berkemer* presciently acknowledged that, as a consequence, "the police and lower courts will continue occasionally to have difficulty deciding exactly when a suspect has been taken into custody." *Id.* at 441.The Third Circuit has identified some relevant factors:

> (1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning.

*United States v. Willaman*, 437 F.3d 354, 359-60 (3d Cir. 2006). I have considered these factors, while keeping in mind the Supreme Court's admonition that the totality of the circumstances must be considered.

when the statements are made, 'something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates they would not have heeded a request to depart or to allow the suspect to do so.' " *United States v. Leese*, 176 F.3d 740, 743 (3d Cir.1999) (quoting *Steigler v. Anderson*, 496 F.2d 793, 799 (3d Cir.1974)) (quoting *United States v. Hall*, 421 F.2d 540, 545 (2d Cir. 1969)). A key question is whether "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). That inquiry is highly fact-intensive, based on the totality of the circumstances. The court's determination incorporates a reasonable-person standard, and therefore must rest on "the objective circumstances of the investigation, rather than the subjective views harbored by ither the interrogating officers or the person being questioned." *Stansbury v. California,* 511 U.S. 318, 323 (1994).

I here incorporate the summary of the facts set forth at pp. 15-18, *supra*. Taking them in their entirety, I find they establish that Mr. Hubbard was in custody, requiring that his unwarned statements in response to interrogation be suppressed. While I do not mean to imply that a traffic stop is so inherently coercive as to amount to custody, I find that the peculiar circumstances here went beyond ordinary investigation and placed Mr. Hubbard in a situation akin to arrest.

One key factor is Det. Akere's immediate perception of the odor of marijuana when he approached the Kia and Hubbard opened the window. Akere's subjective impressions are not, of course, decisive; what matters is that Akere immediately conveyed *to Hubbard* that he had smelled marijuana.

Akere ordered Hubbard out of the car. Hubbard vociferously resisted. While maintaining a professional demeanor, Akere threatened Hubbard with arrest if he did not comply.[23] To be sure, officers conducting a traffic stop may

---

23 The prosecution spins this as an implicit representation that he would not be arrested if he did comply. In context, that characterization has little weight.

order the driver out of the car for security reasons. *See Pennsylvania v. Mimms,* 434 U.S. 106 (1977). This was not, however, a mere security pat-down. It followed a threat of arrest, and was accompanied by questioning regarding marijuana and ownership of the car.

Akere, responding to Hubbard's continuing queries, stated that Hubbard was pulled out of the car, not based on the traffic offense, but on the smell of marijuana emanating from the car. He ordered Hubbard to keep his hands up and to lay down his cell phone, with which Hubbard sought to record the encounter.

A reasonable driver in Hubbard's position would know that the smell of marijuana placed him in jeopardy of criminal charges. Such a driver would also know that the air fresheners and loose panel were readily visible to the police. Such fears would only be confirmed by Akere's questioning, which was not directed to cell phone use, speeding, or tinted windows. Akere repeatedly asked Hubbard whether he had marijuana or had smoked marijuana in the car. The repetitive questioning conveyed skepticism of Hubbard's denials. Akere also asked about any "work" done to the car (likely probing for an explanation of the loose panel). Apparently having checked the car's registration to another person, Akere asked Hubbard whether he was the only person who drives the car, a clear attempt to tie Hubbard to ownership of any contraband that might be found therein. All the while, Hubbard had been frisked with his hands up, and had been moved to the side of a busy highway, flanked by a police officer and a guard rail. He could neither drive away nor walk away from the encounter. The police never told Hubbard he was free to leave.

Officer Akere himself conceded that Hubbard, though not yet formally under arrest, was being held, and was not free to leave:

> Q. At that point in time when you say he was detained, was he free to leave if he wanted to, or he was being held there?
>
> A. He was being held there.

(Tr. 94; *see also* Tr. 35.) The police continued searching the car, as Hubbard protested that he had no marijuana.

On the other hand, the officers were not hostile, did not unholster any weapons, and did not prolong the encounter. They returned the $102 found in Mr. Hubbard's pocket, which they presumably would not have done in connection with an actual arrest.

The custody issue is a close one, but I find that, under the circumstances, a reasonable driver would perceive that the police were holding him and intended to keep holding him.

Because the context was custodial, the issue boils down to whether Hubbard made any evidentiary statements in response to interrogation. Certain questions and statements directed to the issuance of a traffic summons are inevitable incidents of a traffic stop. Requests for license and registration, asking the driver to get out of the car, questions directly related about the traffic infractions would all seem to be fair game. More problematic, however, are questions aimed at the driver, now a captive audience, which are reasonably perceived to be aimed at obtaining evidence of a separate criminal offense. I do not say that such questions cannot be asked. But they must, in a custodial context, be preceded by *Miranda* warnings.

The defendant has not specified the statements he seeks to suppress, and the government has not identified the statements it would seek to introduce in evidence. I therefore direct both sides to identify such statements, in writing, by 1 pm on Monday, March 6, 2023.

**ORDER**

Accordingly, for the reasons expressed above,

**IT IS** this 3rd day of March, 2023,

**ORDERED** that

The motion to suppress evidence based on the illegality of the car stop or the ensuing searches of the car are **DENIED**;

The motion to suppress statements made in response to interrogation during the traffic stop is generally **GRANTED**, with both sides to identify the relevant statements in writing before 1 pm on Monday, March 6, 2023.

/s/ Kevin McNulty

______________________________
**KEVIN MCNULTY, U.S.D.J.**